300 Ga. 582
FINAL COPY

S16A1597. SMILEY v. THE STATE.

HINES, Chief Justice.

Marcus Bernard Smiley appeals his convictions and sentences for malice murder, aggravated battery, and first degree cruelty to children, all in connection with the death of three-month-old Mia Williams and injuries to seven-month-old Tyre Mears. For the reasons that follow, we affirm in part and vacate in part.[1]

1. Smiley contends that the evidence was insufficient to support his convictions.

When evaluating the sufficiency of evidence, the proper standard

---

[1] The crimes against Mia Williams occurred between September 30, 2013 and October 1, 2013; the crimes against Tyre Mears occurred on or about June 15, 2013. On March 24, 2014, a Grady County grand jury indicted Smiley for: Count 1 – malice murder of Mia Williams; Count 2 – felony murder of Mia Williams while in the commission of the crime of cruelty to children in the first degree; Count 3 – cruelty to children in the first degree committed upon Mia Williams; Count 4 – cruelty to children in the first degree committed upon Tyre Mears; Count 5 – aggravated battery of Mia Williams; and Count 6 – aggravated battery of Tyre Mears. Smiley was tried before a jury March 16-18, 2015, and found guilty on all counts. On April 16, 2015, Smiley was sentenced to life in prison without the possibility of parole for malice murder, consecutive sentences of 20 years in prison for each count of cruelty to children in the first degree, and consecutive sentences of 20 years in prison for each count of aggravated battery; the guilty verdict for felony murder stood vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (4) (434 SE2d 479) (1993). Smiley filed a motion for an out-of-time appeal on January 13, 2016, which was granted on January 14, 2016. Smiley filed a notice of appeal on January 15, 2016, and his appeal was docketed in this Court for the September 2016 term and submitted for decision on the briefs.

for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence. [Cits.]

*Mickens v. State*, 277 Ga. 627, 627-628 (593 SE2d 350) (2004).

Construed to support the verdicts, the evidence showed that Smiley dated Amanda Mears Mitchell ("Mitchell"), the mother of Tyre Mears ("Tyre"), in June 2013. The injuries to Tyre for which Smiley was indicted occurred on or about Saturday, June 15, 2013. During that month, Smiley frequently stayed the night at Mitchell's house. Mitchell had two other children, then aged three and five; prior to Tyre's injuries, none of her children had serious medical conditions or injuries. On June 4, 2013, Smiley babysat Mitchell's children, including Tyre, and was alone with them for 45 minutes. He spent that night with Mitchell, during which she woke, and discovered that Smiley and Tyre were not in her bedroom, where they both slept. Mitchell called for Smiley, he entered the bedroom carrying Tyre: she asked what he was doing, and he responded that Tyre had been crying, and that he "woke up and got him." The next day, Mitchell noted that Tyre had some markings on his stomach and

2

buttocks, and took him to a physician, who determined that the markings included a bruise consistent with being made by a finger.  While at the physician's office, Mitchell called the local office of the Department of Family and Children Services and reported the injury, but the Department did not contact her to follow up on the report.

On Thursday, June 13, 2013, Mitchell took Tyre to his godmother, who frequently babysat him.  Tyre began to jerk his head and grab his ear, and his godmother took him to a hospital emergency room, where he was diagnosed with an ear and throat infection; there was no sign at that time that he had serious physical injuries.  While Tyre was at the hospital, Mitchell and Smiley arrived; Smiley held him, Tyre cried and struggled against him, then stopped when his godmother took him from Smiley.

On Saturday, June 15, 2013, Smiley babysat Tyre alone for several hours; Mitchell's other two children were in the care of Mitchell's mother. Tyre was asleep when Mitchell returned home, and slept for an unusual length of time that day.  That night, Mitchell noted red marks on the right side of Tyre's face between his ear and cheekbone as well as marks on his rib cage. Mitchell's mother also saw the bruises on Tyre's abdomen. The next day, Tyre was

unusually cranky and clingy, but Mitchell assumed it was due to the earlier ear infection.

On Monday, June 17, 2013, Mitchell's mother came to Mitchell's house and noticed a bruise on Tyre's abdomen. Tyre's godmother also came, and took Tyre to her home; she noticed that he was lethargic and not behaving normally, and seemed to flinch when she picked him up. When his godmother played with him, and he laughed, he began to hiccup; usually this amused him, but he began to scream. His godmother determined that his head was swollen and "spongy" to the touch, and took him to the hospital. There, physicians concluded that Tyre had suffered multiple skull fractures and rib fractures.[2] Mitchell went to the hospital where investigating law enforcement officers questioned her, and she speculated that her three-year-old son could have caused the bruises on Tyre, then stated that she saw Tyre try to pull himself up on a table leg, then fall down; when informed that such an event would not cause the injuries seen, she admitted that she had not seen such an incident, and stated that she believed Smiley had caused the injuries, but said that this was based only on intuition. That same day, Tyre was taken to another hospital, where it was determined that

---

[2] Tyre was later diagnosed with Stage Two Autism.

he had seven skull fractures and several rib fractures, which had probably been inflicted that weekend; expert medical testimony was that it would not have been possible for Tyre to have been examined by a physician on Thursday, June 13, 2013 without that physician noticing the bruising to Tyre's head. Later, an investigator interviewed Mitchell who stated she had been evasive in earlier interviews because she loved Smiley, thought she was carrying his child, felt guilty about not protecting Tyre, and did not want people to believe that she was a bad parent.

In early September 2013, Smiley began dating Courtney Williams ("Williams"), the mother of Mia Williams ("Mia"), and he frequently stayed the night at Williams's house. Williams had one other child, then aged five; neither Mia nor Williams's other child had any health issues or injuries, except the other child was once hospitalized for asthma. During September 2013, Mia became increasingly fussy, difficult to feed, and would spit up her milk. On September 25, 2013, Williams was in the kitchen adjacent to the living room where Mia and Smiley were alone when Mia screamed loudly. Williams rushed into the room and asked Smiley what happened; he stated that something must have startled the infant. Williams later called 911 after she was unable to calm Mia

5

down and Mia exhibited seizure-like symptoms. When paramedics arrived and examined Mia, she was crying, but otherwise appeared normal with healthy vital signs. Smiley stayed in the back bedroom while paramedics were there.

On the night of September 30 - October 1, 2013, Smiley was again staying over at Williams's home. At approximately 4:00 a.m., about an hour after Mia had last been fed, Williams found Smiley in the living room holding Mia. Smiley stated that he had picked the baby up because she was crying. An argument ensued over Smiley's decision to take Mia out of her crib; Smiley placed Mia back in her crib, and Williams and Smiley went back to sleep.

Later in the morning of October 1, 2013, Williams found Mia in her crib moaning, with her head arched back and her eyes wide open, as if in a seizure. Smiley denied hurting Mia when Williams confronted him. Williams called 911, paramedics arrived, and Mia was rushed to a hospital, but was unresponsive. Mia was quickly transferred to another hospital by helicopter, where physicians determined her injuries had been inflicted within the last 24 hours, and were indicative of abuse, and not an accident. Mia remained at this second hospital for three days, two on life support; life support was then removed, and Mia died. Smiley did not visit Mia or Williams in the hospital, but simply left Williams's

6

home.

Mia's autopsy showed that she had suffered hemorrhaging of the retina and sclera in her eyes, multiple rib fractures and blunt force head trauma. Her eye injuries and rib fractures were consistent with being squeezed, and her head injuries were consistent with violent movement and violent impact of the head. The medical examiner determined the cause of Mia's death was blunt force head trauma and ruled the death a homicide. Expert medical testimony also ruled out causes such as accident or preexisting conditions as to Mia's injuries, as well as to the injuries suffered by Tyre. At trial, both Williams and Mitchell denied harming the victims.

During the investigation into Mia's death, Williams immediately shared her belief that Smiley had caused Mia's injuries. Smiley was interviewed by an investigator regarding Mia's death, and Tyre's injuries. He said that he recognized that the time frames in which the victims' injuries occurred indicated that he, or the mother of each infant, must have inflicted the injuries, but stated he had no idea what happened; when specifically asked whether he might have been involved in some sort of accident in which Mia was injured, he stated that "anything can happen," but that he did not recall "anything of that nature."

7

Smiley also said that he held Mia for only a minute or two during the time that expert testimony indicated Mia's injuries were inflicted; during a telephone call with Williams, he later said that he was alone with Mia for 30 minutes, or perhaps less, during that time frame. He also told the investigator that he had "dated plenty of girls with children," but when asked further about that subject, said he had not babysat their children; when pressed to identify these women, he supplied only one name. During the interview, Smiley repeatedly checked his cell phone, and the investigator had to remind him of the serious nature of the interview. After Mia's death, Smiley repeatedly went to Williams's home and threatened to kill her for accusing him of killing Mia, forcing her on two occasions to call police officers to her home.

Smiley presented defense witnesses, including his sister and cousin, who testified that he had not been violent with their children, and was, in fact, good with them.

Smiley notes that there was no direct evidence presented against him at trial, and asserts that the evidence that was presented did not exclude the possibilities that the death of Mia, and the injuries to Tyre, were caused by their

8

mothers, by some unknown persons, or by accident. OCGA § 24-14-6[3] provides

that

> [t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.

And, under OCGA § 24-14-6,

> questions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law.

*Allaben v. State*, 299 Ga. 253, 255 (1) (787 SE2d 711) (2016). Here, the jury heard expert evidence regarding the injuries suffered by the infants and the timing of those injuries. There was evidence regarding Smiley's movements and behavior toward the victims at the relevant times, his behavior when paramedics arrived at Williams's home, his conduct after the injuries were inflicted upon the infants, and his behavior when discussing the infants' injuries with an investigator.

---

[3] Smiley was tried after January 1, 2013, and thus current OCGA § 24-14-6 applies. See also former OCGA § 24-4-6.

9

The evidence presented at trial authorized the jury to find Smiley guilty beyond a reasonable doubt of each of the crimes of which he was found guilty. *Jackson*, supra; *Allaben*, supra.

2. Smiley contends, and the State concedes, that the crime of aggravated battery committed against Mia merged into the malice murder of Mia. This is correct, and the conviction and sentence entered on Count 5 of the indictment, i.e., the aggravated battery of Mia Williams, must be vacated. *Ledford v. State*, 289 Ga. 70, 72-74 (1) (709 SE2d 239) (2011).

Judgments affirmed in part and vacated in part. All the Justices concur.

Decided February 27, 2017.

Murder. Grady Superior Court. Before Judge Cato.

Ronald R. Parker, for appellant.

Joseph K. Mulholland, District Attorney, Moruf O. Oseni, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.